## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PELLEGRINO FOOD PRODUCTS, INC. | ) | |
| Plaintiff, | ) | Case No.:  1:05-CV-00189 |
| | ) | |
| v. | ) | |
| | ) | |
| RHEON U.S.A., | ) | |
| Defendant/Counterclaim | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PELLEGRINO FOOD PRODUCTS | ) | |
| COMPANY, INC., also known as PELLEGRINO | ) | |
| FOOD PRODUCTS, INC., | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CALIFORNIA FIRST LEASING CORPORATION | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 13

Defendant, Rheon U.S.A., Inc.("Rheon"), by and through counsel, Rhoads & Sinon LLP, files the within Answer, Affirmative Defenses, and Counterclaim to Pellegrino Food Products, Inc.'s ("Pellegrino") Declaratory Judgment and Breach of Contract action as follows.

## ANSWER

## Parties

1.     Rheon is without sufficient information to form a responsive pleading to the allegations contained in Paragraph 1 and the same are therefore denied.

571570.3

2.     It is admitted only that Rheon U.S.A., Inc., identified in the Complaint as "Rheon U.S.A.", is a corporation and maintains an office at 9490 Toledo Way, Irvine, California, 92618.

## Jurisdiction

3.     The allegation contained in Paragraph 3 is a conclusion of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same is denied.

4.     The allegation contained in Paragraph 4 is a conclusion of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same is denied.

## Facts

5.     It is admitted that Rheon sold Pellegrino three (3) KN400 Cornucopia Encrusting Machines in January 2005 at a total cost of $171,000 after a request from Pellegrino. It is further admitted that the machines produce bread and other food products. It is further averred that Pellegrino has failed to pay for such machines, despite accepting delivery of and utilizing the machines for its own business purposes. It is further averred that Rheon sold another KN400 Cornucopia Encrusting Machine to Pellegrino in March 2004 and Pellegrino made payment for that machine.

6.     Admitted in part and denied in part.  It is admitted that Pellegrino was interested in purchasing machines from Rheon.  It is denied that Pellegrino's purchase of the machines was contingent upon Pellegrino obtaining financing from a third-party, or that Pellegrino "informed" Rheon that it "first needed to obtain financing."  To the contrary, Pellegrino advised that it immediately needed the machines because it had

entered into a contract with a substantial customer that it could not fulfill without the machines. Pellegrino specifically represented that it did not even need to obtain financing from a third party, but intended to do so because of the rate to be received. At no point during the negotiations, or thereafter, did Pellegrino ever advise Rheon that its purchase of the machines was contingent upon Pellegrino obtaining financing.

7.    Denied.    The Rheon offer was accepted by Pellegrino on January 18, 2005, and stated only that Rheon would deliver the equipment and return Pellegrino's $3,000.00 deposit after the financing method was finalized. The remaining allegations in Paragraph 7 are conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is required, the same are denied.

8.    Rheon is without sufficient information to form a responsive pleading to the allegations contained in Paragraph 8 and the same are therefore denied. It is averred that both Pellegrino and California First Leasing Corporation ("CalFirst") advised Rheon that the financing arrangements were complete and that a binding financing agreement existed between Pellegrino and CalFirst. It is further averred that Rheon relied upon such representations in shipping the machines to Pellegrino.

9.    Denied. It is specifically denied that CalFirst sent a release letter to Rheon indicating that CalFirst was the purchaser of the machines and was leasing the machines to Pellegrino. To the contrary, as set forth in more detail below, CalFirst sent Rheon a copy of the CalFirst Financing Agreement (hereafter defined) and directed Rheon to ship the machines to Pellegrino. The CalFirst Financing Agreement is a written document which speaks for itself. At no point did CalFirst indicate that it was the purchaser of the machines.

10.    The allegations contained in Paragraph 10 relate to a written document that speaks for itself. It is specifically denied that Rheon signed any agreement which obligated that CalFirst make payment to Rheon.  It is specifically denied that Pellegrino had no obligation to make payment to Rheon for the machines purchased in the event Pellegrino did not consummate its financing for the machines, as it represented to Rheon. To the contrary, Pellegrino maintained an obligation to either arrange for 100% financing of the machines or to pay for the machines directly in the event it did not consummate the financing.

11.    It is admitted that, in January 2005, Rheon shipped the three (3) machines to Pellegrino that Pellegrino had agreed to purchase from Rheon.  It is further averred that representatives of Rheon worked with Pellegrino in connection with the installation of the machines.  It is further averred that Pellegrino utilized the machines to complete a substantial order for a large customer during early 2005. It is further averred that Rheon shipped the machines to Pellegrino only upon representation that Pellegrino and CalFirst had reached an agreement with respect to the financing of the machines by Pellegrino, and a directive by CalFirst to ship the machines to Pellegrino.

12.    Rheon is without sufficient information to form a responsive pleading to the allegations contained in Paragraph 12 and the same are therefore denied. It is averred that, upon information and belief, Pellegrino was advised by CalFirst on or about January 27, 2005 that CalFirst was requiring the personal guaranty of Mr. Thomas Pellegrino. It is further averred that, despite such notice, Pellegrino never advised Rheon of the requirement and Pellegrino's knowledge that Mr. Pellegrino would not execute the personal guaranty.

13.    It is admitted that, at all times, Rheon has advised Pellegrino that Pellegrino owes Rheon the sum of $171,000 for the three machines that were shipped in January 2005, whether from Pellegrino itself or as part of a financing agreement.

14.    Admitted in part and denied in part.  Rheon admits that Pellegrino disputes that Pellegrino owes Rheon $171,000.  Rheon denies that Pellegrino's purchase of the machines was contingent on Pellegrino receiving financing.  Rheon admits that CalFirst acknowledged that CalFirst would be paying for the machines on Pellegrino's behalf as part of its financing arrangement and directive to Rheon to ship the machines to Pellegrino.  It is denied that such agreement by Calfirst impacts Pellegrino's contractual obligation to Rheon. To the contrary, Pellegrino was obligated to pay Rheon for the machines once Pellegrino elected not to consummate the agreement with CalFirst for the financing of the machines.

15.    Rheon admits that Pellegrino belatedly offered to return the three machines to Rheon after Pellegrino completed its use of the machines to fill a substantial order in early 2005.  Rheon admits that it declined Pellegrino's offer. Rheon admits that it continues to insist on payment. It is further averred that the use of the machines by Pellegrino for the purpose for which they were purchased has caused a substantial diminution in the value of those machines  As Rheon will set forth more fully in a Counterclaim against Pellegrino, however, Rheon insists on payment because Pellegrino had a binding contract with Rheon to purchase the machines, or because Pellegrino was unjustly enriched as a result of its utilization of the machines, Rheon delivered the machines in full performance of the contract, Pellegrino accepted the machines and used the machines in furtherance of contractual obligations Pellegrino

had as a supplier, and Pellegrino has breached its contract with Rheon by failing to pay for the machines or completing its financing of the machines.

16.    Denied. It is specifically denied that Rheon made any guarantees with respect to the machines, or that the machines did not operate properly or as advertised. To the contrary, the machines operated properly at all times. It is further averred that at no point did Pellegrino take the position that the machines worked improperly or offer a reason for its failure to pay for the machines when it knew it had not consummated its financing with CalFirst.

17.    Denied. It is denied that Pellegrino advised Rheon that it intended to produce a five ounce product on its production lines.

18.    Denied. It is denied that Rheon ever guaranteed, promised, or represented that the machines would produce 3,600 units per hour. To the contrary, the sales literature associated with the KN400 specifically provides that the output on the machine is between 10 and 60 units per minute. The number of units produced per minute is directly related to the nozzle size, width, length, and cut of the product.  It is further averred that Pellegrino was aware of such factors.

19.    Rheon admits that its sales literature for the KN400 indicates that the maximum extruding capacity is 360 kilograms per hour.  The actual extruding capacity will vary, however, depending on many different factors including, *inter alia*, nozzle size, width, length, and cut of the product. It is further averred that Pellegrino was, at all times, aware of such facts and had purchased and operated a KN400 machine previously.

20.    Denied.

21.    The allegations contained in Paragraph 21 are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same are denied. It is specifically denied that Pellegrino relied upon the machines in making a bid to its customer. To the contrary, Pellegrino represented to Rheon that it had already entered into a contract with its customer and needed the machines immediately in order to fill the order. It is specifically denied that Rheon made any representations regarding the machines that were not accurate or that the machines did not perform properly.

22.    Rheon is without sufficient information to form a responsive pleading to the allegations contained in Paragraph 22 and the same are therefore denied.  It is specifically denied that Rheon made any guarantees to Pellegrino or that Pellegrino did or could have relied on such guarantees. It is further averred that Pellegrino represented to Rheon that it had already entered into a contract with its customer and needed the machines immediately in order to fill the order.

23.    Rheon is without sufficient information to form a responsive pleading to the allegations contained in Paragraph 23 and the same are therefore denied.  It is specifically denied that Rheon made any guarantees to Pellegrino or that Pellegrino did or could have relied on such guarantees. It is further averred that, at no time, did Pellegrino complain to Rheon that the machines were not operating properly. It is further averred that, as of February 8, 2005, the machines were producing approximately 30 products per minute in connection with the production being undertaken by Pellegrino. It is further averred, as set forth in more detail below, that

Pellegrino acknowledged as of February 8, 2005 that the machines were functioning properly and as expected.

24.    Rheon is without sufficient information to form a responsive pleading to the allegations contained in Paragraph 24 and the same are therefore denied.  It is specifically denied that Rheon made any guarantees to Pellegrino or that Pellegrino did or could have relied on such guarantees. It is further averred that Pellegrino represented to Rheon that it had already entered into a contract with its customer and needed the machines immediately in order to fill the order.

25.    The allegations contained in Paragraph 25 are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same are denied.  It is specifically denied that Rheon is responsible for, or liable in connection with, any alleged losses sustained by Pellegrino.

26.    The allegations contained in Paragraph 26 are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same are denied.  It is specifically denied that Rheon is responsible for or liable in connection with any alleged losses sustained by Pellegrino.  It is specifically denied that Rheon made promises regarding the machines purchased or that the machines purchased did not function properly.

27.    The allegations contained in Paragraph 27 are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same are denied.

## COUNT I–DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

28.     Rheon incorporates by reference its responses to Paragraphs 1 through 27 as though set forth fully herein.

29.     The allegations contained in Paragraph 29 are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same are denied.  It is specifically denied that Pellegrino's purchase of the machines was contingent upon the receipt of financing and it is denied that Pellegrino acted in good faith in connection with obtaining financing.  It is further averred that Pellegrino does owe $171,000 to Rheon in connection with the purchase of the machines.

## COUNT II-BREACH OF CONTRACT

30.     Rheon incorporates by reference its responses to Paragraphs 1 through 29 as though set forth fully herein.

31.     The allegations contained in Paragraph 31 are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same are denied.  It is specifically denied that Rheon guaranteed that the machines it sold would produce any specific amount of product.  It is further denied that the machines did not function properly.  To the contrary, Pellegrino repeatedly has acknowledged that the machines functioned as expected in order to enable it to complete its order.

32.     The allegations contained in Paragraph 32 are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same are denied.

## COUNT III-BREACH OF WARRANTY

33.    Rheon incorporates by reference its responses to Paragraphs 1 through 32 as though set forth fully herein.

34.    The allegations contained in Paragraph 34 relate to a written document that speaks for itself.  To the extent a responsive pleading is required, all allegations are denied.

35.    Denied.

## REQUEST FOR RELIEF

36.    The allegations contained in Paragraph 36 are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is required, the same are denied.

37.    Rheon admits that Pellegrino has demanded a jury trial.

WHEREFORE, Defendant, Rheon USA, having fully answered Plaintiff's Complaint, respectfully requests that this Honorable Court dismiss the Complaint and enter judgment in favor of Rheon and against Pellegrino, and award Rheon its costs, attorneys' fees, and such other amounts as provided in the parties' agreement and as the Court deems proper.

## AFFIRMATIVE DEFENSES

1.    Rheon hereby incorporates and asserts each and every affirmative defense applicable under state and federal law.

2.    Plaintiff's Complaint fails to state a cause of action upon which relief can be granted against Rheon.

3.      Plaintiff's Complaint must be dismissed because Plaintiff failed to join CalFirst as a defendant, as required by Federal Rule of Civil Procedure 19(a).

4.      Plaintiff's claims are barred, in whole or in part, by the applicable Statute of Limitations.

5.      Plaintiff's claims are barred, in whole or in part, by the Statute of Frauds.

6.      Plaintiff's claims are barred, in whole or in part, by the economic loss doctrine.

7.      Plaintiff's claims are barred, in whole or in part, by the doctrines of estoppel and waiver.

8.      Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

9.      Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

10.     Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

11.     Rheon breached no contractual duty to Plaintiff and has, at all times, complied with applicable contractual requirements.

12.     Plaintiff breached its contract with Rheon by failing to consummate its financing and arrange for payment for the machines, or by failing to pay for the machines directly.

13.     The damages for which Plaintiff complains, assuming Plaintiff has suffered any such damages, were caused solely by the acts of third persons over whom Rheon did not have control, or by Plaintiff or its representatives.

14.     In the event it is determined that any amount is owed Plaintiff by Rheon, Plaintiff and/or its representatives acted negligently and/or in bad faith in causing such amount to be owed.

15.    Plaintiff has failed, in whole or in part, to mitigate any damages it claims are owing.

16.    The precise financing method was a non-essential term that governed only the timing of delivery of the machines.

17.    Plaintiff made oral representations that it had originally intended to purchase the additional machines with internal funds, which were readily available; however, Plaintiff decided to finance the machines through CalFirst because its interest rate was so attractive.

18.    During negotiations, Plaintiff represented to Rheon that it needed the machines immediately and that either CalFirst would finance them or Plaintiff would simply pay for the machines itself.

19.    At no point was obtaining financing a condition precedent to the agreement between Plaintiff and Rheon.

20.    Once Plaintiff advised that it intended to finance the machines, consummating the financing method was a promise or covenant which Plaintiff failed to satisfy or perform.

21.    Assuming that obtaining financing was a condition precedent to performance, which is expressly denied, Plaintiff waived such condition by accepting the machines and then using the machines for its production purposes; because Rheon relied on such conduct to its detriment, Plaintiff is estopped from asserting a claim to the contrary.

22.     Rheon relied on representations by Plaintiff that it had obtained financing from CalFirst when in fact it had not; consequently, Plaintiff is estopped from asserting a claim to the contrary.

23.     Count III of Plaintiff's Complaint fails as a matter of law because it fails to provide notice of the alleged breach of warranty, including the time when the defect was discovered and the time and manner in which such notice was given to Rheon.

WHEREFORE, Rheon respectfully requests this Honorable Court to dismiss Plaintiff's claims and award it costs, including reasonable counsel fees, along with any other relief that this Court deems proper.

## COUNTERCLAIM

Rheon U.S.A. Inc., files the within Counterclaim against Pellegrino Food Products Company, Inc. and California First Leasing Corporation as follows:

## PARTIES

1.     Counterclaim Plaintiff, Rheon U.S.A., Inc. (Rheon), is a New Jersey corporation with its principal place of business at 9490 Toledo Way, Irvine, California 92618.

2.     Counterclaim Defendant Pellegrino Food Products Company, Inc. ("Pellegrino"), identified in the Complaint as "Pellegrino Food Products, Inc.", is a Pennsylvania corporation with its principal place of business at 100 Lookout Street, Warren, Pennsylvania 16365.

3.     Counterclaim Defendant California First Leasing Corporation ("CalFirst") is a California corporation with its principal place of business at 18201 Von Karman Avenue, Suite 800, Irvine, California 92612.

## JURISDICTION AND VENUE

4.     Jurisdiction exists in this judicial district over the claims advanced in the original Complaint pursuant to 28 U.S.C. §1332(a).

5.     This Counterclaim is a counterclaim pursuant to Federal Rule of Civil Procedure 13(a), in that the claims arise out of the same transaction or occurrence that is the subject matter of the original Complaint.

6.     Counterclaim Defendant CalFirst is added as a party pursuant to Federal Rule of Civil Procedure 13(h).

7.     Jurisdiction exists in this judicial district over this Counterclaim pursuant to 28 U.S.C. § 1367(a).

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391.

## FACTS

9.     Rheon manufactures, sells, and installs automated food processing machinery.

10.     Pellegrino is an original product manufacturer and a contract processor of food products.

11.     CalFirst, a wholly owned subsidiary of California First National Bancorp, is engaged in lease financing for businesses throughout the United States.

12.     At all times relevant to this action, Thomas Pellegrino was President of Pellegrino.

13.     In or around March 2004, Thomas Pellegrino contacted Rheon indicating that he wanted to purchase an automated food processing machine known as a "KN400."

14.     Mr. Pellegrino advised that it was imperative that he obtain the KN400 machines immediately because Pellegrino had entered into an agreement with a customer to fill a large order and did not have the capacity to complete the order.

15.     The order that had to be filled was the production of "pepperoni balls," and without the KN400, Pellegrino was unable to produce that product at all.

16.     The parties reached an agreement on the terms and on or about March 9, 2004, Rheon installed the first KN400 at Pellegrino's facility in Warren, Pennsylvania.

17.    Approximately six months later, Pellegrino indicated to a Rheon sales representative visiting Pellegrino's facility that Pellegrino was having no problems with the KN400.

18.    In early January 2005, Rheon became aware that Pellegrino was interested in the purchase of additional machines from Rheon.

19.    Mr. Pellegrino advised Rheon that Pellegrino had entered into a substantial contract with one of its customers, Wal-Mart, to create certain products to be sold in conjunction with "March Madness."

20.    As he had in 2004, Mr. Pellegrino indicated that he had entered into the agreement with Wal-Mart despite not having the capacity to complete the order,

21.    As such, Pellegrino immediately needed three additional KN400 machines.

22.    A meeting was immediately scheduled and, on January 18, 2005, a representative of Rheon traveled to Pellegrino's Warren facility to meet with Mr. Pellegrino.

23.    At the time, Mr. Pellegrino provided Rheon with an example of the product it needed to produce, which was a 5¼ inch, 5.2 ounce "cheesestick."

24.    The parties entered into a written agreement for the KN400 machines. [Agreement, attached hereto as Exhibit "A"].

25.    The parties bargained over the price, arriving at a figure of $57,000 per machine.

26.    For the valuable consideration of $171,000, Rheon agreed to deliver and install three KN400 machines at Pellegrino's Warren facility.

27.     In return, Pellegrino made a deposit of $3,000 and agreed that it would either obtain financing through a third party or would pay for the machines with its own funds.

28.     Rheon agreed to ship the machines and return the deposit uncashed once the financing method was confirmed.

29.     Pellegrino advised that it had been solicited by CalFirst for over one year to obtain financing through CalFirst and that CalFirst had offered such a competitive rate that Pellegrino had to accept the offer.

30.     Pellegrino advised that it had already negotiated with CalFirst for the financing of the purchase of the machines, was approved, and simply needed to finalize the price.

31.     On January 14, 2005, an account executive from CalFirst sent a financing proposal ("the CalFirst Agreement") to Pellegrino.

32.     Under the CalFirst Agreement, Pellegrino would be obligated to make twenty-four consecutive monthly payments of $7,549.65 to CalFirst and was granted the option of buying the machines at the end of the lease for $1.00. [CalFirst Agreement, attached hereto as Exhibit "B"].

33.     On January 18, 2005, the same day as the meeting with Rheon where the price of the machines was negotiated, Mr. Pellegrino signed the CalFirst Agreement and submitted the deposit required thereby.

34.     Under the terms of the CalFirst Agreement, CalFirst's financing committee had the power to require personal guarantors.

35.    As such, when Pellegrino executed the financing agreement, Pellegrino promised or covenanted to CalFirst that Pellegrino would provide personal guarantors if CalFirst so required.

36.    Pellegrino was adamant about its immediate need for the machines.

37.    On January 18, 2005, and again on January 19, 2005, Rheon advised both Pellegrino and CalFirst that it would not ship the machines unless it obtained either (1) payment in full from either Pellegrino or CalFirst; or (2) a purchase order or directive from CalFirst to ship the machines to Pellegrino.

38.    In response, on January 19, 2005, Rah-miel Mitchell (Mitchell), a CalFirst Account Executive who at all relevant times was acting on behalf of and subject to the control of CalFirst, with the consent and actual or apparent authority of CalFirst, sent a copy of the executed CalFirst Agreement to Rheon and explicitly instructed Rheon to "go ahead and start shipping" the machines to Pellegrino. [CalFirst Instruction, attached hereto as Exhibit "C"].

39.    Pursuant to CalFirst's directive, Rheon shipped the machines on January 19, 2005.

40.    At the same time, Rheon submitted an invoice to CalFirst, identifying that the machines had been shipped to Pellegrino and that payment in the amount of $171,000 was due and owing. [CalFirst Invoice, attached hereto as Exhibit "D"].

41.    A Rheon technician installed the machines at Pellegrino's Warren facility starting on or about January 28, 2005, and concluding on or about February 1, 2005. [Maintenance Service Report, attached hereto as Exhibit "E"].

42. During the installation process, Rheon became aware, for the first time, that the product that Pellegrino intended to produce differed substantially from the product description provided during the meeting on January 18, 2005.

43. The differences included, among other things, a product filled with chunks of pepperoni as opposed to a plain cheesestick.

44. The inclusion of pepperoni in the product resulted in an increase in size of the product that would cause the proposed nozzle to jam.

45. Moreover, Pellegrino had purchased boxes for the products that were over six inches in length, and wanted the product to be longer, but without sacrificing width.

46. On February 3, 2005, a representative of Rheon again traveled to Pellegrino's facility to address the altered product.

47. Rheon provided Pellegrino with an explanation and various alternatives to make the new product.

48. Pellegrino admitted that it had numerous production problems on its end.

49. On February 8, 2005, two representatives traveled to Pellegrino's facility to discuss the machines.

50. At the time, the machines were being used for the production of the product.

51. Moreover, Pellegrino executed Rheon's Handing Over Certification on that date. [Handing Over Certification, attached hereto as Exhibit "F"].

52. In executing the Handing Over Certification, Pellegrino acknowledged that its product was satisfactorily tested on the machines and that the "test verified

successfully the performance of the electrical system, all the mechanical parts, as well as the output of the machine."

53.    Pellegrino further acknowledged that it accepted the machines "to be in operating condition" and did not identify any areas that if found to be "not in order."

54.    At no point during the meetings of February 3, 2005 or February 8, 2005 did Pellegrino complain about the operation of the machines.

55.    Upon information and belief, Pellegrino was advised on or about January 27, 2005, at the latest, by Michael Curtis, Vice-President for CalFirst, that CalFirst was not going to pay Rheon for the KN400 machines until Thomas Pellegrino personally guaranteed the financing.

56.    Pellegrino knew, as of that date, that Mr. Pellegrino would not personally guaranty the financing.

57.    Despite knowing that it was not going to consummate the financing arrangement with CalFirst, Pellegrino failed to disclose such information to Rheon, permitted the installation of the KN400 machines, attended multiple meetings with Rheon, executed the Handing Over Certification, and utilized the KN400 machines for its own benefit to complete the order for its customer for which the machines were needed.

58.    CalFirst also failed to disclose such information to Rheon, and failed to ever advise Rheon that CalFirst did not believe it was obligated to pay the January 19, 2005 invoice because of Pellegrino's failure to consummate the financing agreement.

59.    Despite knowing that Mr. Pellegrino would not execute the guaranty and that CalFirst did not intend to pay the invoice submitted on January 19, 2005 because the Calfirst

Financing Agreement was not consummated by Pellegrino, CalFirst failed to disclose such information to Rheon.

60.     On or about February 4, 2005, as an act of good faith to help Pellegrino develop its altered product, Rheon provided Pellegrino with test parts and components for the machines. [Test Parts List, attached hereto as Exhibit "G"].

61.     Pellegrino accepted the parts but, to date, has neither returned the parts nor made payment for the parts.

62.     On or about February 23, 2005, a Rheon technician made another visit to Pellegrino's Warren facility, among other things, to help Pellegrino as a result of the alteration of the planned product.

63.     At no point during any of those visits did Pellegrino ever advise Rheon that it knew that CalFirst would not be paying the invoice because Pellegrino had refused to consummate the financing agreement, or that Pellegrino believed it was not obligated to pay the invoice.

64.     At no point during any of those visits did Pellegrino ever advise that the machines were not functioning properly or that it believed that Rheon had failed to comply with its obligations under the parties' agreement.

65.     Instead, Pellegrino continued to utilize the machines for its own benefit and to complete the order for which the machines were purchased.

66.     On or about March 23, 2005, CalFirst terminated its agreement with Pellegrino by refunding the $7,549.65 check that Pellegrino had put down as a deposit on the CalFirst Financing Agreement. [April 13, 2005 Letter, attached hereto as Exhibit "H"].

67.    Pellegrino failed to disclose to Rheon that CalFirst had terminated the financing agreement by returning the deposit check on March 23, 2005, and continued to use the KN400 machines for its own benefit and to complete its order for Wal-Mart.

68.    CalFirst failed to disclose to Rheon that it had terminated the CalFirst Financing Agreement by returning the deposit check on March 23, 2005, or that it did not intend to pay the invoice that was submitted by Rheon in reliance upon the January 19, 2005 directives of CalFirst.

69.    On or about April 13, 2005, CalFirst wrote Thomas Pellegrino a letter taking the position that CalFirst and Pellegrino did not have a valid financing agreement for the Rheon machines. [April 13, 2005 Letter, attached hereto as Exhibit "H"].

70.    According to the April 13, 2005 Letter, CalFirst terminated the agreement because Pellegrino refused to provide personal guarantors, even though, under the terms of its agreement with CalFirst, Pellegrino promised or covenanted to provide personal guarantors if CalFirst's financing committee determined them to be necessary.

71.    Pellegrino failed to disclose to Rheon that CalFirst had terminated the CalFirst Financing Agreement and continued to use the KN400 machines for its own benefit and to complete its order for Wal-Mart.

72.    CalFirst failed to disclose to Rheon that it had terminated the CalFirst Financing Agreement or that it did not intend to pay the invoice submitted by Rheon in reliance upon the January 19, 2005 directives of CalFirst.

73.    In early April 2005, Rheon contacted Mr. Pellegrino to explain that Rheon still had not been paid for the machines.

74.     Mr. Pellegrino feigned surprise that Rheon had not been paid by CalFirst and advised that he would immediately contact CalFirst to determine why payment had not yet been made.

75.     At the time, Rheon had no knowledge that both Pellegrino and CalFirst had disavowed liability to the other under the CalFirst Financing Agreement.

76.     At the time, Mr. Pellegrino was well-aware that Rheon had not been paid by CalFirst, and that the reason Rheon had not been paid was because Pellegrino had refused to consummate the financing transaction with CalFirst, causing CalFirst to terminate the CalFirst Financing Agreement.

77.     Pellegrino failed to disclose those facts to Rheon.

78.     Subsequently, Pellegrino, for the first time, advised Rheon that it had not consummated its financing arrangement with CalFirst.

79.     On May 2, 2005, Pellegrino advised CalFirst and Rheon, for the first time, that it was disavowing its contract with CalFirst. [May 2, 2005 Letter, attached hereto as Exhibit "I"].

80.     On or about May 10, 2005, Pellegrino wrote a letter to Rheon stating, among other things, that Rheon should look for payment from CalFirst and that "we have not used these machines under direction of our attorney" even though he knew that the machines had been used extensively to fill the order for which Pellegrino had purchased the machines.  [May 10, 2005 Letter, attached hereto as Exhibit "J"].

81.     As of the date of this Counterclaim, Pellegrino has not returned any of the machines or test parts provided by Rheon.

## COUNT I—BREACH OF CONTRACT

## RHEON V. PELLEGRINO

82.     Rheon incorporates the above paragraphs by reference as though set forth fully herein.

83.     Rheon and Pellegrino entered into an agreement whereby Rheon would sell three KN400 machines to Pellegrino for a price of $171,000.00.

84.     Pursuant to the agreement, Pellegrino would finance the machines and payment would be made directly from the financing company to Rheon.

85.     Rheon complied with all of its obligations under the parties' agreement.

86.     Pellegrino had an obligation to consummate the financing arrangement to insure payment, or to make payment on its own.

87.     Pellegrino breached its contract with Rheon by failing to effect payment for the machines or by failing to pay for the machines.

88.     Pellegrino has still not reimbursed Rheon for the machines and thus Rheon has suffered damages at least in the amount of $171,000.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Pellegrino in an amount in excess of $75,000.00, together with interest, attorneys' fees, costs and all such other and further relief permitted by law, the parties' agreement or as the Court may deem just and proper.

## COUNT II-UNJUST ENRICHMENT (ALTERNATIVE COUNT)

## RHEON V. PELLEGRINO

89.     Rheon incorporates the above paragraphs by reference as though set forth fully herein.

90.     Relying on representations by Pellegrino and CalFirst that Pellegrino had obtained financing for the machines, Rheon furnished the machines to Pellegrino who used the machines in furtherance of its operations without paying Rheon for the use of the machines.

91.     Pellegrino's substantial use of the machines has diminished the value of the machines.

92.     Pellegrino has used Rheon's machines at Rheon's expense and for Pellegrino's benefit without paying for the benefit of the use of Rheon's machines.

93.     As a direct and proximate cause of such unjust enrichment, Rheon has sustained damages in an amount in excess of $171,000.00.

94.     Injustice will result if recovery is denied.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Pellegrino in an amount in excess of $75,000.00, together with interest, attorneys' fees, costs and all such other and further relief as permitted by law or as the Court may deem just and proper.

## COUNT III – PROMISSORY ESTOPPEL (ALTERNATIVE COUNT)

## RHEON V. PELLEGRINO

95.     Rheon incorporates the above paragraphs by reference as though set forth fully herein.

96.     Pellegrino promised to Rheon that, in exchange for Rheon's agreement to sell the KN400 machines to Pellegrino, Pellegrino would either pay Rheon directly for the machines or arrange for payment through financing, which Pellegrino represented was already in place.

97.     Rheon performed all of its obligations owed to Pellegrino.

98.    It was reasonable for Pellegrino to expect that its promise to Rheon would induce Rheon to deliver the KN400 machines.

99.    Rheon would not have delivered the KN400 machines without payment or assurance that the financing arrangements for the machines had been completed.

100.    Rheon relied upon Pellegrino's promise to pay, or arrange for the payment through financing, for the KN400 machines it purchased from Rheon.

101.    Pellegrino has benefited at Rheon's expense by failing to pay, or arrange for payment, of $171,000 to Rheon in exchange for Rheon's delivery of the KN400 machines to Pellegrino.

102.    Injustice will result if Pellegrino's promise to pay Rheon is not enforced.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Pellegrino in an amount in excess of $75,000.00, together with interest, attorneys' fees, costs and all such other and further relief as permitted by law or as the Court may deem just and proper.

## COUNT IV – UNIFORM COMMERCIAL CODE

### RHEON V. PELLEGRINO

103.    Rheon incorporates the above paragraphs by reference as though set forth fully herein.

104.    Rheon is a "seller" as such term is defined in §2103 of the Pennsylvania Uniform Commercial Code, 13 Pa. C.S.A. §2103.

105.    Pellegrino is a "buyer" as such term is defined in §2103 of the Pennsylvania Uniform Commercial Code, 13 Pa. C.S.A. §2103.

106.    The machines sold by Rheon to Pellegrino constituted "goods" as such term is defined in §2105 of the Pennsylvania Uniform Commercial Code, 13 Pa. C.S.A. §2105.

107.    As a result of Pellegrino's failure to pay the purchase price of the machines, Rheon is entitled to recover, together with incidental damages, the price of the machines. 13 Pa. C.S.A. § 2709.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Pellegrino in an amount in excess of $75,000.00, together with attorneys' fees, costs and all such other and further remedies and relief permitted under the Uniform Commercial Code and as the Court may deem just and proper.

## COUNT V-CONVERSION

## RHEON V. PELLEGRINO

108.    Rheon incorporates the above paragraphs by reference as though set forth fully herein.

109.    Pellegrino misrepresented the fact that it had secured financing for the machines, and it wrongfully possessed and misappropriated the machines for its own uses.

110.    Pellegrino wrongfully deprived Rheon of its property and, through the substantial use of the property, has converted Rheon's property.

111.    Pellegrino intended to keep, convert to its use and permanently deprive Rheon of the machines without making payment or arranging for the payment for such machines.

112.    Pellegrino did not have lawful justification or authorization to obtain, use, and keep these machines without making or arranging for the payment for such machines.

113.    Pellegrino, by its actions, has engaged in the conversion of Rheon's property, for which Pellegrino is liable.

114.    Pellegrino's conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling Rheon to an award of punitive damages.

115.    As a direct and proximate result of the conversion of its property by Pellegrino, Rheon has sustained damages in an amount in excess of $171,000.00.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Pellegrino in an amount in excess of $75,000.00, together with punitive damages, attorneys' fees, costs and all such other and further relief as the Court may deem just and proper.

## COUNT VI – MISAPPROPRIATION

### RHEON V. PELLEGRINO

116.    Rheon incorporates the above paragraphs by reference as though set forth fully herein.

117.    Pellegrino misrepresented the fact that it had secured financing for the machines, and it wrongfully possessed and misappropriated the machines for its own uses.

118.    Pellegrino wrongfully deprived Rheon of its property and, through the substantial use of the property, has misappropriated Rheon's property.

119.    Pellegrino intended to keep, convert to its use and permanently deprive Rheon of the machines without making payment or arranging for the payment for such machines.

120.    Pellegrino did not have lawful justification or authorization to obtain, use, and keep these machines without making or arranging for the payment for such machines.

121.    Pellegrino, by its actions, has engaged in the misappropriation of Rheon's property, for which Pellegrino is liable.

122.    Pellegrino's conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling Rheon to an award of punitive damages.

123.    As a direct and proximate result of the misappropriation of its funds by Pellegrino, Rheon has sustained damages in an amount in excess of $171,000.00.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Pellegrino in an amount in excess of $75,000.00, together with punitive damages, attorneys' fees, costs and all such other and further relief as the Court may deem just and proper.

## COUNT VII – FRAUD

## RHEON V. PELLEGRINO

124.    Rheon incorporates the above paragraphs by reference as though set forth fully herein.

125.    Pellegrino misrepresented the status of its financing arrangements to Rheon when Pellegrino failed to disclose to Rheon that it had not obtained financing for the machines, and when it acted as if it still had financing in place for the machines.

126.    Pellegrino misrepresented the fact that it did not have financing in place and that it had refused to consummate its financing agreement with CalFirst.

127.    Pellegrino knew such representations were false when they were uttered and knew that it had a duty to disclose the facts relating to its failed financing to Rheon.

128.    Pellegrino knew that such representations would stop Rheon from demanding payment or repossessing the machines, thus allowing Pellegrino enough time to meet its voluminous and urgent order.

129.    Rheon justifiably relied on the representations that Pellegrino had financing with CalFirst.

130.    As a result of Pellegrino's misrepresentations and continued use of the machines with no intention to pay, Rheon suffered damages.

131. Pellegrino's conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling Rheon to an award of punitive damages.

132. As a direct and proximate result of the misappropriation of its funds by Pellegrino, Rheon has sustained damages in an amount in excess of $171,000.00.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Pellegrino in an amount in excess of $75,000.00, together with punitive damages, attorneys' fees, costs and all such other and further relief as the Court may deem just and proper.

## COUNT VIII—BREACH OF CONTRACT

## RHEON V. CALFIRST

133. Rheon incorporates the above paragraphs by reference as though set forth fully herein.

134. The CalFirst Financing Agreement constituted an offer which Pellegrino accepted on January 18, 2005, when Thomas Pellegrino signed it.

135. The offer and acceptance was supported by good and valuable consideration.

136. CalFirst promised to lease the machines to Pellegrino.

137. In exchange, Pellegrino promised to pay twenty-four monthly payments to CalFirst for use of the machines.

138. In the alternative, even if the leasing proposal constituted an offer from Pellegrino to Rheon to enter into a leasing contract, CalFirst accepted the offer on January 19, 2005, when it instructed Rheon to ship the equipment to Pellegrino.

139. By its actions of January 19, 2005, instructing Rheon to ship the equipment to Pellegrino, CalFirst is estopped from arguing that it did not enter into a binding leasing contract

that required it to purchase the machines from Rheon and subsequently lease the machines to Pellegrino.

140.    As the manufacturer of the machines that CalFirst was purchasing and subsequently leasing to Pellegrino, Rheon was an intended third-party beneficiary of the leasing contract.

141.    CalFirst breached the leasing contract by telling Rheon to ship the machines and then failing and refusing to perform under the terms of the contract.

142.    Specifically, CalFirst breached the contract by failing to pay Rheon for the machines Rheon furnished pursuant to the leasing contract.

143.    In addition, by its actions of January 19, 2005, ordering Rheon to ship the machines, CalFirst waived its power to require a personal guarantee from Pellegrino.

144.    Thus, CalFirst also breached its leasing contract by requiring Pellegrino to provide personal guarantors weeks after Rheon had shipped and installed the machines and after Pellegrino had begun production on the machines.

145.    As a third-party beneficiary of the breached contract who has suffered damages as a result of the breach, Rheon may bring suit on the contract and recover damages against the parties who breached the contract.

146.    CalFirst has still not reimbursed Rheon for the machines and thus Rheon has suffered damages at least in the amount of $171,000.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Counterclaim Defendant California First Leasing Corporation in an amount in excess of $171,000.00, together with interest, costs, attorneys' fees, and all such other and further relief as permitted by law or as the Court may deem just and proper.

## COUNT IX - UNJUST ENRICHMENT (ALTERNATIVE COUNT)

## RHEON V. CALFIRST

147.    Rheon incorporates the above paragraphs by reference as though set forth fully herein.

148.    Relying on representations by Pellegrino and CalFirst that Pellegrino had obtained financing for the machines, Rheon furnished the machines to Pellegrino who used the machines in furtherance of its operations without paying Rheon for the use of the machines.

149.    Pellegrino's substantial use of the machines has diminished the value of the machines.

150.    Pellegrino used Rheon's machines at Rheon's expense and for Pellegrino's benefit without paying for the benefit of the use of Rheon's machines.

151.    As a direct and proximate cause of such unjust enrichment, Rheon has sustained damages in an amount in excess of $171,000.00.

152.    Injustice will result if recovery is denied.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Counterclaim Defendant California First Leasing Corporation in an amount in excess of $75,000.00, together with interest, attorneys' fees, costs and all such other and further relief as permitted by law and as the Court may deem just and proper.

## COUNT X – PROMISSORY ESTOPPEL (ALTERNATIVE COUNT)

## RHEON V. CALFIRST

153.    Rheon incorporates the above paragraphs by reference as though set forth fully herein.

154.    On January 19, 2005, through its directive to Rheon to "go ahead and start shipping out the machines", and delivery of the CalFirst Financing Agreement, CalFirst promised Rheon that it would pay the amount referenced in the invoice dated January 19, 2005.

155.    Rheon relied upon that promise by shipping the KN400 machines to Pellegrino.

156.    Rheon would not have shipped the KN400 machines to Pellegrino had CalFirst not made the promises and representations set forth above.

157.    It was reasonable for CalFirst to expect that its promise to Rheon would induce Rheon to deliver the KN400 machines.

158.    Rheon would not have delivered the KN400 machines without payment or assurance that the financing arrangements for the machines had been completed and instructions to ship from Calfirst.

159.    CalFirst has benefited at Rheon's expense by failing to pay, or arrange for payment, of $171,000 to Rheon in exchange for Rheon's delivery of the KN400 machines to Pellegrino.

160.    Injustice will result if CalFirst's promise to pay Rheon is not enforced.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Counterclaim Defendant California First Leasing Corporation in an amount in excess of $75,000.00, together with interest, attorneys' fees, costs and all such other and further relief as the Court may deem just and proper.

## COUNT XI – ACCOUNT STATED (ALTERNATIVE COUNT)

## RHEON V. CALFIRST

161.    Rheon incorporates the above paragraphs by reference as though set forth fully herein.

162.    On January 19, 2005, through its directive to Rheon to "go ahead and start shipping out the machines", and delivery of the CalFirst Financing Agreement, CalFirst promised Rheon that it would pay the amount referenced in the invoice dated January 19, 2005.

163.    Rheon relied upon that promise by shipping the KN400 machines to Pellegrino and submitting an invoice to CalFirst for payment. [Invoice, attached hereto as Exhibit "D"].

164.    At no point after receipt of such invoice did CalFirst object to the invoice or indicate that it did not intend to honor the invoice.

165.    As early as January 27, 2005, CalFirst was aware that there were serious issues with respect to whether Mr. Thomas Pellegrino would execute the personal guaranty that CalFirst was requiring, yet failed to disclose that fact to Rheon or object to the invoice.

166.    The shipment of the machines pursuant to the leasing contract and the January 19, 2005, instructions constituted the sale of goods to CalFirst.

167.    Between February 2, 2005 and April 29, 2005, Rheon advised CalFirst on at least one occasion that CalFirst's account was past due.

168.    On or about April 29, 2005, Rheon contacted Michael Curtis, Vice-President of CalFirst, to inform CalFirst that it was ninety days delinquent in paying its account. [April 29, 2005 Letter, attached hereto as Exhibit "K"].

169.    Prior to that contact, CalFirst had neither objected to the invoice nor indicated that it did not believe it was obligated to pay the invoice.

170.    CalFirst has not paid and continues to refuse to pay the invoice.

171.    Injustice will result if CalFirst's promise to pay Rheon is not enforced.

WHEREFORE Counterclaim Plaintiff, Rheon U.S.A., Inc. demands judgment in its favor and against Defendant California First Leasing Corporation in an amount in excess of

$75,000.00, together with interest, attorneys' fees, costs and all such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

RHOADS & SINON LLP

By:     /s/ Robert J. Tribeck
        Robert J. Tribeck, Esquire
        Attorney I.D. No. 74486
        Rhoads & Sinon LLP
        One South Market Square, 12th Floor
        Harrisburg, PA 17108-1146

Dated:  September 7, 2005          Attorneys for Defendant, Rheon U.S.A., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2005, a true and correct copy of the foregoing Defendant's Answer, Affirmative Defenses, and Counterclaim was served by means of electronic service in accordance with the Western District Local Rules, upon the following:

**Jmead85@aol.com**

John J. Mead, Esquire
Scarpetti & Mead Law Firm
1001 State Street, Suite 800
Erie, PA 16501


and by service of original process pursuant to
Federal Rule of Civil Procedure 4, upon:

California First Leasing Corporation
c/o Glen T. Tsuma, Agent for Service
18201 Von Karman Avenue
Suite 800
Irvine, CA 92612


/s/ Robert J. Tribeck
Robert J. Tribeck