# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PELLEGRINO FOOD PRODUCTS, INC. | ) | |
| Plaintiff, | ) | Case No.:  1:05-CV-00189 |
| | ) | |
| v. | ) | |
| | ) | |
| RHEON U.S.A., | ) | |
| Defendant/Counterclaim | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PELLEGRINO FOOD PRODUCTS | ) | |
| COMPANY, INC., also known as PELLEGRINO | ) | |
| FOOD PRODUCTS, INC., | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CALIFORNIA FIRST LEASING CORPORATION | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## RHEON U.S.A.'S BRIEF IN OPPOSITION TO MOTION FOR CHANGE OF VENUE PURSUANT TO 28 U.S.C. § 1404(a) FILED BY COUNTERCLAIM DEFENDANT CALIFORNIA FIRST LEASING CORPORATION

Robert J. Tribeck, Esquire
Attorney I.D. No. 74486
Rhoads & Sinon LLP
One South Market Square, 12th Floor
Harrisburg, PA 17108-1146

Attorneys for Defendant, Rheon U.S.A., Inc.

Dated:  November 7, 2005

584092.1

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

COUNTER-STATEMENT OF FACTS ...................................................................... 2

STANDARD OF REVIEW ......................................................................................... 11

      A.    Substantial Contacts Exist Between The Plaintiff's Chosen
           Forum And The Persons Or Events At Issue In The Litigation. .......... 13

      B.    Private Factors Including The Convenience For Potential
           Witnesses Do Not Favor Transfer To The Central District. .................. 17

      C.    The Dispute Resolution and Choice of Law Provisions In The
           CalFirst Lease Agreement Are Not Determinative Of Venue In
           The Present Matter. ....................................................................................... 19

      D.    Public Factors Also Do Not Favor Transfer To The Central
           District. ............................................................................................................. 20

CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

### FEDERAL CASES

*Access Finance Lending Corp.*, Civ. Act. No. 96-191,
1996 U.S. Dist. LEXIS 14073 (W.D. Pa., Sept. 4, 1996) ........................15, 16, 20, 21, 22, 25

*Britamco Underwriters, Inc. v. Raymond E. Wallace Special Prod., Inc.*,
56 F. Supp. 2d 542 (E.D. Pa. 1999).......................................................................14, 15, 16, 20

*Daramola v. Westinghouse Electric Corp.*,
757 F. Supp. 657 (W.D. Pa. 1990) .......................................................................................16

*Eberhart v. Baker*,
652 F. Supp. 1475 (W.D. Pa. 1987) ....................................................................................16

*Jumara v. State Farm Insurance Co.*,
55 F.3d 873 (3d Cir. 1995) ..........................................................................14, 15, 20, 22, 24

*Shutte v. Armco Steel Corporation*,
431 F.2d, 22 (3rd Cir. 1970), *cert. den.* 401 U.S. 910 (1971) ........................15, 20, 22, 24, 25

### FEDERAL STATUTES

28 U.S.C. 1391(a)................................................................................................................16

28 U.S.C. § 1404(a) .......................................................................4, 14, 16, 20, 21, 23, 25, 26

## INTRODUCTION

Defendant/Counterclaim Plaintiff, Rheon U.S.A., Inc. ("Rheon"), by and through counsel, Rhoads & Sinon LLP, submits the within Brief in Opposition to the Motion for Change of Venue pursuant to 28 U.S.C. § 1404(a) (the "Motion") filed by Counterclaim Defendant California First Leasing Corporation ("CalFirst").    Through its Motion, CalFirst seeks to have this Court transfer the present case in its entirety to the United States District Court for the Central District of California (Southern Division) (hereafter referred to as the "Central District").[1]    As a result, the present Motion impacts upon not just Rheon and CalFirst, but also Plaintiff/Counterclaim Defendant Pellegrino Food Products, Inc. ("Pellegrino"), which initiated the present action in this Court.

In support of its Motion, CalFirst makes four principal arguments.  First, CalFirst claims that a change of venue is appropriate because there are allegedly few contacts between the chosen forum and the person or events involved in the suit.  [CalFirst's Memorandum of Law in Support of Motion, pp. 11-12].  Second, CalFirst maintains that the convenience of witnesses would be advanced by a transfer to the Central District. [CalFirst's Memorandum of Law in Support of Motion, pp. 12-14].  Third, CalFirst asserts that the terms of a Lease Agreement as between CalFirst and Pellegrino, to which Rheon maintains it is a third party beneficiary, compels the requested transfer. [CalFirst's Memorandum of Law in Support of Motion, pp. 14-16].  Fourth and finally,

---

[1]    CalFirst seeks to have the entire case moved because the requisite diversity is lacking for just Rheon's counterclaims against CalFirst to be transferred and because, contrary to CalFirst's suggestion, "a substantial part of the act or omissions giving rise to [Rheon's counterclaims" would not be found to have occurred within the Central District.

CalFirst argues that public factors identified by the Supreme Court as relevant to a motion for change of venue do not favor venue in this Court has originally selected by Pellegrino. [CalFirst's Memorandum of Law in Support of Motion, pp. 16-17].

For the reasons set forth below, CalFirst arguments, individually and collectively, do not enable CalFirst to meet its substantial and high burden of establishing that a balancing of proper factors strongly favors transfer, nor do those arguments overcome the presumption that the plaintiff's choice of forum should rarely be disturbed. As a result, this Court should deny CalFirst's Motion.

## COUNTER-STATEMENT OF FACTS

The following facts are drawn principally from the facts presented by Rheon in its Counterclaim as contained in Rheon's "Answer, Affirmative Defenses and Counterclaim Pursuant to Federal Rule of Civil Procedure 13," which was filed with this Court on September 7, 2005. Additional facts are drawn from the affidavit of Gary Seiffer, which Rheon has attached hereto as Exhibit "A."

The facts are recited hereunder to provide the Court with a complete picture of all events at issue in this litigation, not just those events in which CalFirst was directly involved as was principally featured in the section entitled "Facts and Procedural History" within CalFirst's Memorandum of Law in Support of the Motion (pp. 4-8). In that regard, explicit emphasis is provided below with respect to the many relevant events occurring at Pellegrino's facilities in Warren, Pennsylvania, which is located within the territorial jurisdiction of this Court.

There are three parties to the present litigation. First, Rheon is a New Jersey corporation with its principal place of business in Irvine, California. [Counterclaim, ¶1]. Rheon manufactures, sells, and installs automated food processing machinery.

[Counterclaim, ¶9].  Gary Seiffer is the sales representative for Rheon, U.S.A., who was principally involved, on behalf of Rheon, in Rheon's sale of machines to Pellegrino. [Seiffer Aff., ¶¶ 2-3].  Mr. Seiffer is based out of Monroe, Connecticut.[2]  [Seiffer Aff., ¶2].

Second, Pellegrino is a Pennsylvania corporation with its principal place of business in <u>Warren, Pennsylvania</u>.  [Counterclaim, ¶2].  Pellegrino is an original product manufacturer and a contract processor of food products.  [Counterclaim, ¶10].

Third, CalFirst is a California corporation with its principal place of business in Irvine, California.  [Counterclaim, ¶3].  CalFirst, a wholly owned subsidiary of California First National Bancorp, is engaged in lease financing for businesses throughout the United States.  [Counterclaim, ¶11].

At all times relevant to this action, Thomas Pellegrino was President of Pellegrino. [Counterclaim, ¶12].  In or around March 2004, Thomas Pellegrino contacted Rheon indicating that he wanted to purchase an automated food processing machine known as a "KN400."  [Counterclaim, ¶13].  Mr. Pellegrino advised that it was imperative that he obtain the KN400 machine immediately because Pellegrino had entered into an agreement with a customer to fill a large order and did not have the capacity to complete the order.  [Counterclaim, ¶14].

The order that had to be filled was the production of "pepperoni balls," and without the KN400, Pellegrino was unable to produce that product at all.

---

[2]     Mr. Seiffer has affirmed that he would anticipate serving as the principal witness for Rheon if a trial were to result in this case.  [Seiffer Aff., ¶4].  As he is based out of Connecticut, he has further affirmed that should a trial occur, it would be considerably more convenient for him to serve as a witness if the trial took place in Pennsylvania as opposed to California.  [Seiffer Aff., ¶5].

[Counterclaim, ¶15].  The parties reached an agreement on the terms and on or about March 9, 2004, Rheon installed the first KN400 at Pellegrino's facility in <u>Warren, Pennsylvania</u>.  [Counterclaim, ¶16].

Approximately six months later, Pellegrino indicated to a Rheon sales representative visiting Pellegrino's facility in <u>Warren, Pennsylvania</u> that Pellegrino was having no problems with the KN400.  [Counterclaim, ¶17].  In early January 2005, Rheon became aware that Pellegrino was interested in the purchase of additional machines from Rheon.  [Counterclaim, ¶18].  Mr. Pellegrino advised Rheon that Pellegrino had entered into a substantial contract with one of its customers, Wal-Mart, to create certain products to be sold in conjunction with "March Madness." [Counterclaim, ¶19].

As he had in 2004, Mr. Pellegrino indicated that he had entered into the agreement with Wal-Mart despite not having the capacity to complete the order. [Counterclaim, ¶20].  As such, Pellegrino immediately needed three additional KN400 machines.  [Counterclaim, ¶21].  A meeting was immediately scheduled and, on January 18, 2005, a representative of Rheon traveled to Pellegrino's <u>Warren, Pennsylvania</u> facility to meet with Mr. Pellegrino.  [Counterclaim, ¶22].

At the time, Mr. Pellegrino provided Rheon with an example of the product it needed to produce, which was a 5¼ inch, 5.2 ounce "cheesestick."  [Counterclaim, ¶23]. The parties entered into a written agreement for the KN400 machines. [Counterclaim, ¶24].  The parties bargained over the price, arriving at a figure of $57,000 per machine. [Counterclaim, ¶25].  For the valuable consideration of $171,000, Rheon agreed to deliver and install three KN400 machines at Pellegrino's <u>Warren, Pennsylvania</u> facility.

[Counterclaim, ¶26]. In return, Pellegrino made a deposit of $3,000 and agreed that it would either obtain financing through a third party or would pay for the machines with its own funds. [Counterclaim, ¶27]. Rheon agreed to ship the machines and return the deposit uncashed once the financing method was confirmed. [Counterclaim, ¶28].

Pellegrino advised that it had been solicited by CalFirst for over one year to obtain financing through CalFirst and that CalFirst had offered such a competitive rate that Pellegrino had to accept the offer. [Counterclaim, ¶29]. Pellegrino advised that it had already negotiated with CalFirst for the financing of the purchase of the machines, was approved, and simply needed to finalize the price. [Counterclaim, ¶30].

On January 14, 2005, an account executive from CalFirst sent a financing proposal ("the CalFirst Agreement") to Pellegrino at its Warren, Pennsylvania office. [Counterclaim, ¶31]. Under the CalFirst Agreement, Pellegrino would be obligated to make twenty-four consecutive monthly payments of $7,549.65 to CalFirst and was granted the option of buying the machines at the end of the lease for $1.00. [Counterclaim, ¶32]. On January 18, 2005, the same day as the meeting with Rheon where the price of the machines was negotiated, Mr. Pellegrino signed the CalFirst Agreement and submitted the deposit required thereby. [Counterclaim, ¶33].

Under the terms of the CalFirst Agreement, CalFirst's financing committee had the power to require personal guarantees. [Counterclaim, ¶34]. As such, when Pellegrino executed the financing agreement, Pellegrino promised or covenanted to CalFirst that Pellegrino would provide personal guarantees if CalFirst so required. [Counterclaim, ¶35]. Pellegrino was adamant about its immediate need for the machines. [Counterclaim, ¶36]. On January 18, 2005, and again on January 19, 2005, Rheon advised both Pellegrino and

CalFirst that it would not ship the machines unless it obtained either (1) payment in full from either Pellegrino or CalFirst; or (2) a purchase order or directive from CalFirst to ship the machines to Pellegrino. [Counterclaim, ¶37].

In response, on January 19, 2005, Rah-miel Mitchell (Mitchell), a CalFirst Account Executive who at all relevant times was acting on behalf of and subject to the control of CalFirst, with the consent and actual or apparent authority of CalFirst, sent a copy of the executed CalFirst Agreement to Rheon and explicitly instructed Rheon to "go ahead and start shipping" the machines to Pellegrino. [Counterclaim, ¶38 (attached hereto as Exhibit "B")]. Pursuant to CalFirst's directive, Rheon shipped the machines to Warren, Pennsylvania on January 19, 2005. [Counterclaim, ¶39]. At the same time, Rheon submitted an invoice to CalFirst, identifying that the machines had been shipped to Pellegrino and that payment in the amount of $171,000 was due and owing. [Counterclaim, ¶40].

A Rheon technician installed the machines at Pellegrino's Warren, Pennsylvania facility starting on or about January 28, 2005, and concluding on or about February 1, 2005. [Counterclaim, ¶41]. During the installation process, Rheon became aware, for the first time, that the product that Pellegrino intended to produce differed substantially from the product description provided during the meeting on January 18, 2005. [Counterclaim, ¶42]. The differences included, among other things, a product filled with chunks of pepperoni as opposed to a plain cheesestick. [Counterclaim, ¶43]. The inclusion of pepperoni in the product resulted in an increase in size of the product that would cause the proposed nozzle to jam. [Counterclaim, ¶44]. Moreover, Pellegrino

had purchased boxes for the products that were over six inches in length, and wanted the product to be longer, but without sacrificing width. [Counterclaim, ¶45].

On February 3, 2005, a representative of Rheon again traveled to Pellegrino's facility in <u>Warren, Pennsylvania</u> to address the altered product. [Counterclaim, ¶46]. Rheon provided Pellegrino with an explanation and various alternatives to make the new product. [Counterclaim, ¶47]. Pellegrino admitted that it had numerous production problems on its end. [Counterclaim, ¶48].

On February 8, 2005, two representatives traveled to Pellegrino's facility in <u>Warren, Pennsylvania</u> to discuss the machines. [Counterclaim, ¶49]. At the time, the machines were being used for the production of the product. [Counterclaim, ¶50]. Moreover, Pellegrino executed Rheon's Handing Over Certification on that date. [Counterclaim, ¶51]. In executing the Handing Over Certification, Pellegrino acknowledged that its product was satisfactorily tested on the machines and that the "test verified successfully the performance of the electrical system, all the mechanical parts, as well as the output of the machine." [Counterclaim, ¶52]. Pellegrino further acknowledged that it accepted the machines "to be in operating condition" and did not identify any areas that if found to be "not in order." [Counterclaim, ¶53]. At no point during the meetings of February 3, 2005 or February 8, 2005, which took place in <u>Warren, Pennsylvania</u>, did Pellegrino complain about the operation of the machines. [Counterclaim, ¶54].

Upon information and belief, Pellegrino was advised on or about January 27, 2005, at the latest, by Michael Curtis, Vice-President for CalFirst, that CalFirst was not going to pay Rheon for the KN400 machines until Thomas Pellegrino personally guaranteed the financing.

[Counterclaim, ¶55]. Pellegrino knew, as of that date, that Mr. Pellegrino would not personally guarantee the financing. [Counterclaim, ¶56]. Despite knowing that it was not going to consummate the financing arrangement with CalFirst, Pellegrino failed to disclose such information to Rheon, permitted the installation of the KN400 machines in Warren, Pennsylvania, attended multiple meetings with Rheon in Warren, Pennsylvania, executed the Handing Over Certification, and utilized the KN400 machines for its own benefit to complete the order for its customer for which the machines were needed. [Counterclaim, ¶57].

Similarly, CalFirst also failed to disclose such information to Rheon, and failed to ever advise Rheon that CalFirst did not believe it was obligated to pay the January 19, 2005 invoice because of Pellegrino's failure to consummate the financing agreement. [Counterclaim, ¶58]. Despite knowing that Mr. Pellegrino would not execute the guaranty and that CalFirst did not intend to pay the invoice submitted on January 19, 2005 because the CalFirst Financing Agreement was not consummated by Pellegrino, CalFirst failed to disclose such information to Rheon. [Counterclaim, ¶59].

On or about February 4, 2005, as an act of good faith to help Pellegrino develop its altered product, Rheon provided Pellegrino with test parts and components for the machines located in Warren, Pennsylvania. [Counterclaim, ¶60]. Pellegrino accepted the parts but, to date, has neither returned the parts nor made payment for the parts. [Counterclaim, ¶61]. On or about February 23, 2005, a Rheon technician made another visit to Pellegrino's Warren, Pennsylvania facility, among other things, to help Pellegrino as a result of the alteration of the planned product. [Counterclaim, ¶62]. At no point during any of those visits did Pellegrino ever advise Rheon that it knew that CalFirst would not be paying the invoice because Pellegrino had refused to consummate

the financing agreement, or that Pellegrino believed it was not obligated to pay the invoice. [Counterclaim, ¶63]. At no point during any of those visits did Pellegrino ever advise that the machines were not functioning properly or that it believed that Rheon had failed to comply with its obligations under the parties' agreement. [Counterclaim, ¶64]. Instead, Pellegrino continued to utilize the machines for its own benefit and to complete the order for which the machines were purchased. [Counterclaim, ¶65].

On or about March 23, 2005, CalFirst terminated its agreement with Pellegrino by refunding the $7,549.65 check that Pellegrino had put down as a deposit on the CalFirst Financing Agreement. [Counterclaim, ¶66]. Pellegrino failed to disclose to Rheon that CalFirst had terminated the financing agreement by returning the deposit check on March 23, 2005, and continued to use the KN400 machines for its own benefit and to complete its order for Wal-Mart. [Counterclaim, ¶67]. CalFirst failed to disclose to Rheon that it had terminated the CalFirst Financing Agreement by returning the deposit check on March 23, 2005, or that it did not intend to pay the invoice that was submitted by Rheon in reliance upon the January 19, 2005 directives of CalFirst. [Counterclaim, ¶68].

On or about April 13, 2005, CalFirst wrote Thomas Pellegrino a letter, sent to Warren, Pennsylvania, taking the position that CalFirst and Pellegrino did not have a valid financing agreement for the Rheon machines. [Counterclaim, ¶69]. According to the April 13, 2005 Letter, CalFirst terminated the agreement because Pellegrino refused to provide personal guarantees, even though, under the terms of its agreement with

CalFirst, Pellegrino promised or covenanted to provide personal guarantees if CalFirst's financing committee determined them to be necessary. [Counterclaim, ¶70].

Pellegrino failed to disclose to Rheon that CalFirst had terminated the CalFirst Financing Agreement and continued to use the KN400 machines for its own benefit and to complete its order for Wal-Mart. [Counterclaim, ¶71]. CalFirst failed to disclose to Rheon that it had terminated the CalFirst Financing Agreement or that it did not intend to pay the invoice submitted by Rheon in reliance upon the January 19, 2005 directives of CalFirst. [Counterclaim, ¶72].

In early April 2005, Rheon contacted Mr. Pellegrino in <u>Warren, Pennsylvania</u>, to explain that Rheon still had not been paid for the machines. [Counterclaim, ¶73]. Mr. Pellegrino feigned surprise that Rheon had not been paid by CalFirst and advised that he would immediately contact CalFirst to determine why payment had not yet been made. [Counterclaim, ¶74]. At the time, Rheon had no knowledge that both Pellegrino and CalFirst had disavowed liability to the other under the CalFirst Financing Agreement. [Counterclaim, ¶75]. At the time, Mr. Pellegrino was well aware that Rheon had not been paid by CalFirst, and that the reason Rheon had not been paid was because Pellegrino had refused to consummate the financing transaction with CalFirst, causing CalFirst to terminate the CalFirst Financing Agreement. [Counterclaim, ¶76]. Pellegrino failed to disclose those facts to Rheon. [Counterclaim, ¶77].

Subsequently, Pellegrino, for the first time, advised Rheon that it had not consummated its financing arrangement with CalFirst. [Counterclaim, ¶78]. On May 2, 2005, Pellegrino advised CalFirst and Rheon, for the first time, that it was disavowing its contract with CalFirst. [Counterclaim, ¶79]. On or about May 10, 2005, Pellegrino wrote a letter, sent from <u>Warren,</u>

10

Pennsylvania, to Rheon stating, among other things, that Rheon should look for payment from CalFirst and that "we have not used these machines under direction of our attorney" even though he knew that the machines had been used extensively to fill the order for which Pellegrino had purchased the machines.  [Counterclaim, ¶80].  Pellegrino has not returned any of the machines and test parts provided by Rheon.  [Counterclaim, ¶81].  Those machines and test parts presumably remain in Warren, Pennsylvania.

## STANDARD OF REVIEW

CalFirst cites 28 U.S.C. §1404(a) for authority to transfer venue in the present action. Section 1404 states:  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *See* Motion, ¶2.  This grant of discretion to district courts is not, however, to be liberally exercised.  *See Britamco Underwriters, Inc. v. Raymond E. Wallace Special Prod., Inc.*, 56 F. Supp. 2d 542, 545 (E.D. Pa. 1999) (explaining "[a]lthough §1404 gives the district courts discretion to decide a motion to transfer based on an individualized, case-by-case consideration of convenience and fairness, ***such motions are not to be liberally granted***") (citing *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (emphasis added)).

In determining whether to grant a motion to transfer, a court must "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  Specifically, the Third Circuit has provided the following guidance as to the analysis of Section 1404 motions:

> In ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the

11

litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." While there is no definitive formula or list of the factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a).

The private interests have included: plaintiff's forum preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

The public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

*Jumara*, 55 F.3d 873, 879-880 (further citations omitted).

Importantly, the burden is on the moving party to establish that a balancing of proper interests weighs in favor of transfer, ***and this balance must be <u>strongly</u> in favor of transfer***. *See*, *e.g.*, *Shutte v. Armco Steel Corporation*, 431 F.2d, 22, 25 (3rd Cir. 1970), *cert. den.* 401 U.S. 910 (1971); *see also*, *Access Fin. Lending Corp. v. Keystone State Mortg. Corp.*, Civ. Act. No. 96-191, 1996 U.S. Dist. LEXIS 14073, *4 (W.D. Pa., Sept. 4, 1996). "The plaintiff's choice of forum is given great weight in the Section 1404(a) analysis." *Britamco Underwriters, Inc.*, 56 F. Supp. 2d at 545.

## <u>ARGUMENT</u>

In the present matter, CalFirst has correctly answered for the Court in the affirmative the threshold determination of "whether the proposed transferee district [i.e. the Central District] is one in which the action 'might have been brought.'" *Daramola v.*

*Westinghouse Elec. Corp.*, 757 F. Supp. 657, 658 (W.D. Pa. 1990) (citing 28 U.S.C. § 1404(a));

[CalFirst's Memorandum of Law in Support of Motion, pp. 10-11].[3]

Therefore, the present analysis turns to whether CalFirst has met its burden to establish that a balancing of proper interests _strongly_ weighs in favor of transfer.  *Access Fin. Lending Corp.,* 1996 U.S. Dist. LEXIS 14073 at *4.  For the reasons set forth below, Rheon asserts that CalFirst has fallen far short of meeting the requisite burden.

**A.    Substantial Contacts Exist Between The Plaintiff's Chosen Forum And The Persons Or Events At Issue In The Litigation.**

As noted above, "[t]he plaintiff's choice of forum is given great weight in the Section 1404(a) analysis."  *Britamco Underwriters, Inc.*, 56 F. Supp. 2d at 545.  In the present matter, the plaintiff, Pellegrino, resides within the jurisdiction of this Court.  That single fact alone has previously been recognized as a principal basis for denying a Motion to Transfer Venue out of the Western District of Pennsylvania.  *See Eberhart v. Baker*, 652 F. Supp. 1475, 1476 (W.D. Pa. 1987).  In *Eberhart*, this Court reasoned that the "interests of justice" favored denial as the "transfer of this case to Colorado might, in effect, deny plaintiff any opportunity for relief, as plaintiff may not be financially able to pursue his claims in Colorado."  *Id.* at 1477.  While the circumstances of the present case are not as compelling as in *Eberhart* in that Pellegrino is not as

---

[3]    On this point, however, Rheon only concedes the correctness of CalFirst's first argument as to the analysis of the proper venue for the original action, namely that 28 U.S.C. 1391(a)(1) controls, because "[h]ere, Rheon, the only defendant in Pellegrino's Complaint, has its principal place of business in Irvine, California within the [Central District]."  [CalFirst's Memorandum of Law in Support of Motion, p. 10].  CalFirst's second argument is wrong that venue also would have been proper in the Central District based upon 28 U.S.C. 1391(a)(2) as "a substantial part of the act or omissions giving rise to the claim[s]" did not occur within the Central District as CalFirst asserts. [CalFirst's Memorandum of Law in Support of Motion, p. 10].  To the contrary, Rheon agrees with Pellegrino that "a substantial part of the act or omissions giving rise to the claim[s]" occurred within the jurisdiction of this Court as was the asserted basis for jurisdiction in Pellegrino's Complaint.  [Complaint, ¶4].

sympathetic as the *Eberhart* plaintiff, who was litigating *pro se* and *in forma pauperis*, Pellegrino's interest is pursuing its claims within its home jurisdiction is not, as CalFirst attempts to do, lightly cast aside.

On that point, CalFirst asserts that "the plaintiff's choice of venue is entitled to little weight where there are few contacts between the chosen forum and the persons or events involved in the suit . . . ." [CalFirst's Memorandum of Law in Support of Motion, p. 11]. Then, after attempting unsuccessfully to demonstrate how the contacts in the present case are more substantial in California then Pennsylvania, CalFirst concludes by arguing that "from the standpoint of the location of events and persons involved, the Central District is an appropriate venue for all of the claims in this case, and it is the only appropriate venue with respect to Rheon's claims against CalFirst." [CalFirst's Memorandum of Law in Support of Motion, p. 12].  This Court should not sway by CalFirst's self-serving presentation of the contacts at issue in this case as any remotely objective assessment of the events underlying this litigation demonstrate that the quantum and quality of the contacts with Pennsylvania grossly outweigh those suggested by CalFirst has having occurred within California.

Specifically, the basis for the relationship between Pellegrino and Rheon, that gave rise to the transaction resulting in this litigation, was Rheon's sale of a KN400 machine to Pellegrino, which was installed in March 2004 at Pellegrino's facility in <u>Warren, Pennsylvania</u>. [Counterclaim, ¶16].  Subsequently, the transaction at issue in this litigation was first entered into at a meeting in January 2005, between Rheon and Pellegrino in <u>Warren, Pennsylvania</u>.  [Counterclaim, ¶22].  In contemplation of those transactions, on January 14, 2005, an account executive from CalFirst sent the CalFirst Agreement to Pellegrino

14

at its Warren, Pennsylvania office, with proposed terms to finance the transaction between Rheon and Pellegrino. [Counterclaim, ¶31].

Thereafter, a critical event underlying Rheon's claims against CalFirst occurred in that on January 19, 2005, Rah-miel Mitchell sent a copy of the executed CalFirst Agreement to Rheon and explicitly instructed Rheon to "go ahead and start shipping" the machines to Pellegrino. [Counterclaim, ¶38]. CalFirst attempts to illogically limit the geographic scope of this communication by asserting that "Rheon's claims against CalFirst clearly revolve around communications that took place solely between Rheon employees and CalFirst employees located in Irvine, [California]." [CalFirst's Memorandum of Law in Support of Motion, p. 12]. **CalFirst conveniently omits, however, that the importance of the January 19th CalFirst communication is in reliance thereon Rheon shipped its machines to Pellegrino's facility in Warren, Pennsylvania.** [Counterclaim, ¶39]. Therefore, the suggestion that the legal impact of the January 19th CalFirst communication is somehow limited to California or does not extend to Pennsylvania is clearly false.

Further, even after the machines were shipped, Rheon's extensive contacts with Pennsylvania continued as a direct result of both CalFirst and Pellegrino failing to disclose that they had not entered into a financing agreement as CalFirst had represented to Rheon. For example, a Rheon technician installed the machines at Pellegrino's Warren, Pennsylvania facility starting on or about January 28, 2005, and concluding on or about February 1, 2005. [Counterclaim, ¶41]. Thereafter, on February 3, 2005, a representative of Rheon again traveled to Pellegrino's facility in Warren, Pennsylvania to address the machines' performance. [Counterclaim, ¶46]. On

or about February 4, 2005, as an act of good faith to help Pellegrino develop its altered product, Rheon provided Pellegrino with test parts and components for the machines located in <u>Warren, Pennsylvania</u>.  [Counterclaim, ¶60].

Again, on February 8, 2005, two representatives traveled to Pellegrino's facility in <u>Warren, Pennsylvania</u> to discuss the machines.  [Counterclaim, ¶49].  Thereafter, on or about February 23, 2005, a Rheon technician made another visit to Pellegrino's <u>Warren, Pennsylvania</u> facility, among other things, to help Pellegrino as a result of the alteration of the planned product.  [Counterclaim, ¶62].  None of these visits by Rheon to <u>Warren, Pennsylvania</u>, would likely have occurred had either CalFirst or Pellegrino been upfront about the cancellation of their financing agreement.  Also, to this day, the machines and test parts provided by Rheon to Pellegrino, which have never been paid for and are the very subject of this litigation, presumably remain in <u>Warren, Pennsylvania</u>.

Further, after the original shipment of the machines, contact with Pennsylvania was not limited to Rheon and Pellegrino as clearly CalFirst continued to make contact with Pellegrino in Pennsylvania as well.  For example, on or about April 13, 2005, CalFirst wrote Thomas Pellegrino a letter, sent to <u>Warren, Pennsylvania</u>, taking the position that CalFirst and Pellegrino did not have a valid financing agreement for the Rheon machines.  [Counterclaim, ¶69].  As a result of all of the above, CalFirst's argument clearly fails that the contacts at issue in this litigation involving California are even remotely as substantial as those involving Pennsylvania.  Similarly, CalFirst's argument fails that its actions that underlie Rheon's counter-claims against CalFirst are somehow limited in impact to California as in the absence of CalFirst's failure to finance

the sale to Pellegrino, as well as its representation to Rheon that it would finance the sale, Rheon would not have shipped the machines to Pennsylvania in the first instance.

Again, importantly, "[t]he plaintiff's choice of forum is given great weight in the Section 1404(a) analysis." *Britamco Underwriters, Inc.*, 56 F. Supp. 2d at 545. The burden is on the moving party to establish that a balancing of proper interests weighs in favor of transfer, ***and this balance must be <u>strongly</u> in favor of transfer***. *See, e.g.*, *Shutte*, 431 F.2d at 25; *see also*, *Access Fin. Lending Corp.*, 1996 U.S. Dist. LEXIS 14073 at *4. CalFirst has clearly not established that the contacts or events occurring in California warrant transfer of the present action.

## B.     Private Factors Including The Convenience For Potential Witnesses Do Not Favor Transfer To The Central District.

The convenience to witnesses is but one of several private factors that a court considers in its analysis of a motion for change of venue pursuant to 28 U.S.C. §1404(a). *Jumara*, 55 F.3d 873, 879-880. Nevertheless, CalFirst's entire analysis of the private factors is based upon alleged convenience to witnesses, which CalFirst asserts "provides compelling reasons for a transfer to the Central District." [CalFirst's Memorandum of Law in Support of Motion, p. 12]. CalFirst's conclusions with respect to the isolated issue of convenience to the witnesses is decidedly overstated, if not entirely incorrect.

CalFirst's argument does not consider that Gary Seiffer, the sales representative for Rheon, who was principally involved on behalf of Rheon in Rheon's sale of machines to Pellegrino, is based out of Monroe, Connecticut. [Seiffer Aff., ¶¶ 2-3]. Rheon and Mr. Seiffer anticipate that he will serve as the principal witness for Rheon if a trial were to result in this case. [Seiffer Aff., ¶4]. As he is based out of Connecticut, should a trial occur, it would be considerably more convenient for Mr. Seiffer to serve as a witness if the trial

17

took place in Pennsylvania as opposed to California, given the relative geographic proximity of the possible venues to Connecticut.   [Seiffer Aff., ¶5].   This Court has previously recognized that when travel will be required by multiple parties regardless of the choice of venue, the presumption against a transfer of venue is not overcome.[4]   *Access Fin. Lending Corp.,* 1996 U.S. Dist. LEXIS 14073 at *6.

Furthermore, the convenience for potential witnesses is only one of the private factors that is relevant to an analysis of a motion for change of venue pursuant to 28 U.S.C. §1404(a).  The Third Circuit has described the relevant private factors as follows:

> The private interests have included: plaintiff's forum preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

---

[4]     Additionally, CalFirst's arguments as to its individual employees or former employees are not availing.  With respect to Michael Curtis, it is not clear that his testimony would be necessary in the present action (nor is it certain that he would not testify merely because he has indicated to his former employer, CalFirst, at the present time that he would not be inclined to do so).  CalFirst's liability results principally from the act that took place on January 19, 2005 when Rah-miel Mitchell sent a copy of the executed CalFirst Agreement to Rheon and explicitly instructed Rheon to "go ahead and start shipping" the machines to Pellegrino.  [Counterclaim, ¶38].  Whatever testimony Mr. Curtis might provide would not change the fact that Mr. Mitchell took the noted action on behalf of CalFirst and that Rheon relied upon it.  As to Mr. Mitchell himself, Rheon is sympathetic with respect to his scoliosis and that the condition makes it difficult for him to "sit for long periods of time" and that "his physician has advised him against flights of more than 5 hours of flight time *at once*."   [CalFirst's Memorandum of Law in Support of Motion, p. 13 (emphasis added)].  Nevertheless, Rheon would respectfully suggest that the challenges Mr. Mitchell would face in traveling from California to Pennsylvania are somewhat overstated.  First, the necessity of a three-leg flight from Orange County to Erie, as suggested in his affidavit, requiring nearly eight hours of travel time seems unwarranted given that two-leg flights requiring less travel time are available.  Moreover, whether the trip is made in two or three legs, no individual leg would need to exceed the five hour restriction advised by Mr. Mitchell's physician.

*Jumara*, 55 F.3d 873, 879-880 (further citations omitted).   Clearly, the vast majority of the private factors identified by the Third Circuit do not favor transfer of venue to the Central District.   First, the Plaintiff's preference, as discussed in Section A *supra*, is clearly for this Court to adjudicate its claims.   Second, as demonstrated by this filing, Rheon's preference is also for this Court to adjudicate its claims.   Third, as explained in detail in Section A *supra*, the claims at issue arose much more out of and are intertwined with contacts with Pennsylvania rather than California.   Finally, the fact that Pellegrino resides in the jurisdiction of this Court also favors venue here because the machines, which have not been paid for, presumably are still located in Warren, Pennsylvania and because, ultimately, Pellegrino whether directly to Rheon or indirectly by repayment to CalFirst is likely to bear responsibility for payment for the machines. Therefore, based on a full review of the private factors, CalFirst is unable to establish that the private factors favor transfer to the Central District in the present matter.   As a result, CalFirst again fails to meet its burden to establish that a balancing of proper interests weighs **<u>strongly</u>** in favor of transfer.   *See*, *e.g.*, *Shutte*, 431 F.2d at 25; *see also*, *Access Fin. Lending Corp.*, 1996 U.S. Dist. LEXIS 14073 at *4.

## C.     The Dispute Resolution and Choice of Law Provisions In The CalFirst Lease Agreement Are Not Determinative Of Venue In The Present Matter.

CalFirst also argues that transfer to the Central District is favored in the present matter because the CalFirst Agreement has both a California forum selection clause and a California choice of law clause.   CalFirst's argument must be put in the context of the extent to which the CalFirst Agreement will be determinative of the claims at issue in this litigation.   On that point, none of Pellegrino's three claims against Rheon in the original Complaint arises out of or seeks to enforce right under the terms of the CalFirst Agreement.   Similarly, of the twelve counter-claims asserted by Rheon against CalFirst

and Pellegrino collectively, Rheon has asserted only one breach of contract claim against both parties asserting rights as a third party beneficiary under the CalFirst Agreement.

Therefore, whether or not CalFirst's suggestion that Rheon as a third-party beneficiary would be bound by the dispute resolution and choice of law provisions in the CalFirst Agreement is correct, for purposes of the present motion for change of venue, the determinative capacity of the CalFirst Agreement is implicated by at most two of the fifteen claims before this Court. Therefore, at the appropriate juncture, this Court may be called upon to interpret the provisions of the CalFirst Agreement and the extent to which the parties are bound by its respective provisions. At the present time, however, given the Agreement's limited impact upon the claims at issue in the litigation, the dispute resolution and choice of law provisions in the CalFirst Agreement clearly do not compel, nor necessarily in and of themselves favor[5], transfer to the Central District.

**D.    Public Factors Also Do Not Favor Transfer To The Central District.**

The Third Circuit has identified the public factors relevant to a motion for change of venue pursuant to 28 U.S.C. §1404(a) as follows:

> The public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

---

[5]    On this point, were the Court to enforce the forum selection clause in the CalFirst Agreement, the clause compels referral to a private dispute resolution company in California not the Central District.

*Jumara*, 55 F.3d 873, 879-880 (further citations omitted).  In assessing these public factors, CalFirst concludes that "[n]one of these factors favor venue in the Western District of Pennsylvania."  [CalFirst's Memorandum of Law in Support of Motion, p. 16].  On its face, CalFirst's conclusion does not even suggest that CalFirst can approach meeting its burden as the moving party to establish that a balancing of proper interests weighs ***in favor of*** transfer, no less that this balance strongly favors transfer.  *See Shutte*, 431 F.2d at 25.

In that regard, CalFirst admits that several of the factors clearly do not favor transfer, no less strongly favor transfer.  For example, CalFirst acknowledges that "[t]he controversy is local to both Erie, Pennsylvania and Irvine, California."  [CalFirst's Memorandum of Law in Support of Motion, p. 16].  Similarly, CalFirst admits that "[d]epending on the identity of the prevailing party, a judgment in either state could have the same enforceability issues."  [CalFirst's Memorandum of Law in Support of Motion, p. 16].  On this point, CalFirst's attempt to distance itself fully from adjudicating in Pennsylvania are somewhat curious in that invariably if Rheon prevails in its claims against CalFirst, then CalFirst will attempt to recover from Pellegrino through an action that most likely would require obtaining jurisdiction over Pellegrino in Pennsylvania.

At most, CalFirst argues that California is superior on one public factor, namely applicable law, on the basis that the alternative dispute resolution, choice of forum and choice of law provisions in the CalFirst Agreement point toward a California adjudication.  [CalFirst's Memorandum of Law in Support of Motion, pp. 16-17].  This one factor standing alone is surely not sufficient for CalFirst to meet its burden in the present matter.  Moreover, when the totality of the claims at issue in the litigation are

contemplated, it is unclear that this one factor even favors California in that none of Pellegrino's three claims against Rheon arise out of the CalFirst agreement and only two of Rheon's twelve counter-claims against both Pellegrino and CalFirst arguably arise out of the CalFirst Agreement.  Accordingly, CalFirst has unquestionably failed to establish that the public factors favor transfer to the Central District in the present matter.  Therefore, once more, CalFirst fails to meet its burden to establish that a balancing of proper interests weighs **strongly** in favor of transfer.  *See*, *e.g.*, *Shutte*, 431 F.2d at 25; *see also*, *Access Fin. Lending Corp.*, 1996 U.S. Dist. LEXIS 14073 at *4.

## CONCLUSION

For the reasons set forth above, Rheon respectfully requests that the Court deny CalFirst's Motion for Change of Venue pursuant to 28 U.S.C. § 1404(a).

Respectfully Submitted,

RHOADS & SINON LLP

By:    /s/ Robert J. Tribeck
       Robert J. Tribeck, Esquire
       Attorney I.D. No. 74486
       Rhoads & Sinon LLP
       One South Market Square, 12th Floor
       Harrisburg, PA 17108-1146

Dated:  November 7, 2005           Attorneys for Defendant, Rheon U.S.A., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2005, a true and correct copy of the foregoing Brief in Opposition to the Motion for Change of Venue pursuant to 28 U.S.C. § 1404(a) was served by means of electronic service in accordance with the Western District Local Rules, upon the following:

**Jmead85@aol.com**

John J. Mead, Esquire
Scarpetti & Mead Law Firm
1001 State Street, Suite 800
Erie, PA  16501

**jpendleton@mccarter.com**
**lbonsall@mccarter.com**

B. John Pendleton, Esq.
Lisa S. Bonsall, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

/s/ Robert J. Tribeck
Robert J. Tribeck